## ARASAN CHIP SYSTEMS LICENSE AGREEMENT

This License Agreement ("Agreement") is made effective the 20th day February, 2009 ("Effective Date") by and between **Sonix Technology Co., Ltd.,** ("COMPANY") a Taiwan corporation having its principal place of business at _10F-1, No.36, Taiyuan Street, Chupei City Hsinchu, TW, R.O.C. and **Arasan Chip Systems, Inc.** ("Licensor"), a California corporation having its principal place of business at 2010 N. First St., Ste #510, San Jose CA 95110, USA

### RECITALS

A.     Licensor is an ASIC design and intellectual property products company, and Licensor owns the "Licensed Technology", as defined in Exhibit B;

B.     COMPANY, among other things, designs, develops, manufactures and sells integrated circuit products, and desires to license the Licensed Technology for use in such products under the terms and conditions of this Agreement;

C.     In consideration of the mutual covenants herein and for good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

### AGREEMENT

1.     Definitions.  For purposes of this Agreement, the following terms shall have the respective meanings indicated below:

1.1     "Licensed Technology" shall mean the RTL Code, test programs, technical documentation and reference designs provided by Licensor to COMPANY hereunder, as set forth in Exhibit B, and any Updates (defined below) thereto.

1.2     "Licensed Products" shall mean any integrated circuits that are designed by COMPANY, which incorporates or integrates the Licensed Technology.

1.3     "COMPANY" shall mean Sonix Technology Co., Ltd., and all its subsidiaries.

1.4     "Updates" shall mean any bug fixes, modifications and enhancements to the Licensed Technology, which are designed by Licensor to correct or improve the Licensed Technology's performance.

2.      **License.**

2.1      License Grants. Licensor grants to COMPANY a nonexclusive, nontransferable, worldwide, license as follows:

- to use, copy, modify and create derivative works of the Licensed Technology to produce or have produced an initial design (the "Initial Design") for incorporation in Licensed Products only, and to make, have made, use, import, offer for sale, distribute, sell and otherwise transfer ownership of Licensed Products incorporating such Initial Design (in whole or in part), subject to payment of the license fees set forth in Exhibit A (the "License Fee");

- to use, copy, modify and create derivative works of the Licensed Technology to produce ADDITIONAL designs, in addition to Initial Design, (each an "Additional Design") for incorporation in Licensed Products, and to make, have made, use, import, offer for sale, distribute, sell and otherwise transfer ownership of Licensed Products incorporating such Additional Designs (in whole or in part) subject to payment of license fees for the Additional Design License Fee set forth in Exhibit A and Section 6.2;

- to use the Licensed Technology to test only the Licensed Products;

- to synthesize the Licensed Technology for FPGA / ASIC programming; and

Unlimited Use for the MIPI CSI-2 Receiver shall mean:

A worldwide, perpetual, non-exclusive, non-transferable, fully-paid up, royalty-free license, to modify the Software, to use the Software to create Licensed Software Products on a single product and to sub-license in source/object code format for use solely with the Licensed Products, either as a Binary image or as linkable object libraries that contain the MIPI CSI-2 Receiver stack.

The sub-licensee may use the Licensed Technology or portions thereof only with the specific Licensed Products. The Company will have agreements in place with such sub- licensees to enforce this clause. The MIPI CSI-2 RECEIVER stack code cannot be provided to any of the third party technology partners thereby enabling them to develop the MIPI CSI-2 RECEIVER Host or client driver functionality for their technology/products/devices/CPUs/chipsets – which may or may not work in conjunction with the Licensed Products. The third party vendors shall license the MIPI CSI-2 RECEIVER Software Stack directly from Arasan Chip Systems either in Binary or in Source form

Notwithstanding the above, COMPANY may modify, translate and create derivative works of the Licensed Technology only in connection with the development of the Initial and Additional Designs. Ownership and other rights with respect to any new designs created by COMPANY shall vest solely in COMPANY. Licensor reserves all rights not expressly granted to COMPANY in this Agreement.

2.2      Restrictions.   COMPANY shall not knowingly allow others to reverse engineer, decompile, disassemble, or attempt to discover any source code or underlying ideas or algorithms of the object code of any portion of the Licensed Technology.   COMPANY shall not knowingly remove, alter, or obscure any proprietary notices contained on or within the Licensed Technology and shall reproduce such notices on any back-up copy of the Licensed Technology. COMPANY shall promptly notify Licensor should it become aware of any modification, unauthorized use, or infringement of the Licensed Technology. COMPANY may not reproduce, sublicense, distribute,

transfer or dispose of, or otherwise use or exploit the Licensed Technology, in whole or in part, other than as expressly permitted in this Agreement.

3.      **Title.**  The Licensed Technology, including any kits, testing models or software, is owned by Licensor and is protected by United States and international copyright and/or patent laws and treaty provisions.   This Agreement is not a sale and does not transfer to COMPANY any title or ownership interest in or to the Licensed Technology or any patent, copyright, trade secret, trade name, trademark or other proprietary or intellectual property right related to the Licensed Technology.

4.      **Indemnification.**

4.1      Indemnity by Licensor.   Licensor shall defend Company, , successors and assigns, and its and their officers, directors, employees, shareholders and agents (the "Indemnitees"), and help Company defend its customers and distributors, at Company's request, any suit, claim, demand, or proceeding that is attributable, in whole or in part, to: (i) a claim that the Licensed Technology, violates or infringes any United States and/or European patent, including without limitation, direct infringement, indirect infringement, active inducement of infringement and contributory infringement, copyright, trade secret or other proprietary or intellectual property right held or controlled by a third party which may arise at any time out of any past, present or future purchase, use or sale by the Indemnitees of the Licensed Technology; (ii) breach by Licensor of any of its representations and warranties contained in this Agreement; and (iii) any violation by Licensor of any laws, rules, ordinances or regulations arising out of Licensor's acts or omissions, and will indemnify the Indemnitees against, and hold them harmless from, any cost, loss, damage, expense, authorized settlement or liability (including reasonable attorney's fees) arising from or related to such actual or alleged suit, claim, demand or proceeding, provided that Licensor is promptly notified and rendered reasonable assistance as required, and permitted to control the defense and all negotiations for settlement. Licensor shall not be responsible for any settlement made by the COMPANY without Licensor's prior written permission.   Should the Licensed Technology become the subject of a third party claim of infringement of a United States and/or European intellectual property right, the Licensor shall be entitled at its option and its expense, to either (i) procure for COMPANY the right to continue using such Licensed Technology or the infringing portions of Licensed Technology, or (ii) replace or modify Licensed Technology or the infringing portions of Licensed Technology, so that they become non-infringing. If in Licensor's opinion either of the above is not commercially feasible, Licensor will accept return of the infringing Licensed Technology and shall refund to COMPANY all License Fees and other fees paid hereunder by COMPANY for the infringing Licensed Technology, and COMPANY shall have the option to terminate this Agreement or continue it in effect on new terms and conditions to be agreed by the parties. Licensor will have no liability for any claim of intellectual property infringement arising from (i) the combination of Licensed Technology with COMPANY or third party materials, unless in accordance hereunder or it is determined by a court of competent jurisdiction that the Licensed Technology is the infringing element of such claim; (ii) any modifications or derivative works of the Licensed Technology not made by Licensor; (iii) infringing activity continuing after COMPANY has been notified by Licensor thereof or has been informed by Licensor of modifications that would have avoided the alleged infringement; or (iv) the use of other than the most current release of the Licensed Technology delivered by Licensor to the COMPANY, if such claim would have been prevented by the use of the most current release made available to COMPANY.

4.2      Indemnity by Company.  Since Licensor has no control over the specific applications and use COMPANY will make of Licensed Technology, and that third parties may hold intellectual property rights which relate to the Licensed Products, COMPANY shall obtain all necessary licenses from such third party intellectual property right holders. COMPANY agrees at its expense to

defend or cause to be defended Licensor against, and hold it harmless from any suit, claim or proceeding that alleges that the Licensed Products sold by COMPANY infringes upon any intellectual property right of a third party and will indemnify Licensor for any reasonable costs and/or damages awarded against Licensor in such suit, claim or proceeding, provided that COMPANY is promptly notified and rendered reasonable assistance as required, and permitted to control the defense and all negotiations for settlement. COMPANY will have no liability for any claim of indemnity under this Section if it is determined by a court of competent jurisdiction that the Licensed Technology is the infringing element of such claim. COMPANY's total liability under this section shall not exceed the total of all License Fees paid to Licensor by COMPANY.

5.      **Updates and Support.**

    5.1     Support.

            (a)      COMPANY <u>must</u> obtain the first year of technical support and maintenance for the Licensed Technology by paying for a Support and Maintenance Fee equal to <u>$30,000 USD.</u> Licensor shall provide technical support (the "Support") and Upgrades for COMPANY for a period of one year from the date of COMPANY'S first use of the Licensed Technology. Upgrades shall be provided to COMPANY pursuant to a method selected by Licensor, free of charge, as soon as such Upgrades are made available to other licensees. The Support and Maintenance Fee must be paid together with the License Fee as set forth in Section 6.3.

            (b)      Upon expiration of the initial year of Support, COMPANY may renew such Support services for the following year at the rate of <u>15%</u> of the License Fee.

            (c)      A Licensor representative shall be available by telephone during Licensor's normal business hours to assist COMPANY in using the Licensed Technology under Support. If a problem cannot be resolved over the telephone, COMPANY shall provide Licensor with written documentation of the problem. Licensor shall evaluate the problem and use commercially reasonable efforts to provide a temporary work-around solution within ten business days of receipt of written notice from COMPANY with documentation if required. Licensor shall endeavor to correct the problem within 30 calendar days from receipt of written notice as stated above from COMPANY. If Licensor is unable to fix such nonconforming Licensed Technology within such 30-day period, COMPANY may retain such Licensed Technology subject to equitable reduction in License Fee to be agreed upon by both parties or COMPANY may, at its option, cancel the license for such Licensed Technology for a full refund of the License Fees and other fees paid hereunder.

            (d)      Licensor's duty to maintain and provide Support as provided in this Section 5 shall be limited to the current release and one prior release of the Licensed Technology except that Licensor shall maintain, service and provide Support for Licensed Technology for so long as covered by the Maintenance and Support Fee paid by COMPANY. Unless otherwise agreed by both parties in writing, Licensor shall have no duty to support modifications made to the Licensed Technology by COMPANY.

            (e)      COMPANY may at its option purchase additional support of one (1) month of onsite support to be provided with one engineer from Licensor by paying the proposed additional Support Upgrade Fee as outlined in Exhibit A.

6.      **License Fee.**

6.1     License Fee. In consideration for the rights and licenses granted to COMPANY under this Agreement and in consideration for the first year of Support under Section 5, COMPANY shall pay License Fees as set forth in Exhibit A

6.2     Additional Design. An "Additional Design" shall mean a design derivative, which results in a change to one Verilog RTL source. A process shrink of an existing design to produce a new mask without a change in the Verilog RTL Source or a design spin to rework defects or errors is not an Additional Design. Re-synthesizing the same design with or without minor Verilog RTL changes but without any change to its function, or to have it fabricated at a different fabrication plant but without any change to its function will not constitute an Additional Design.

6.3     Payment Terms and Schedule. The payments are due and payable as per the following schedule and terms:

(a) Thirty percent (30%) of the License Fee and One Hundred percent (100%) of the Support & Maintenance Fee and Support Upgrade Fee (if applicable), within five (5) days of execution of the License Agreement.

(b) Forty percent (40%) of the License Fee within Thirty (30) days of delivery of the RTL or GDSII.

(b) Thirty percent (30%) of the License Fee within Ninety (90) days after delivery of GDSII or RTL delivery.

7.     **Audit Rights**. COMPANY shall keep clear and accurate records with respect to the number and identity of each Additional Design for which an Additional Design License Fee is payable. Licensor shall have the right, once each year, through an independent certified public accountant, acceptable to both parties, whose fees are paid by Licensor to examine and audit all relevant records and accounts as may, under recognized accounting practices, contain information bearing upon COMPANY'S compliance with the terms of this Agreement. If any such audit shall disclose that such Additional Design Fees have been underpaid by more than 5%, COMPANY shall bear the reasonable cost of that audit. The auditor's findings shall be final and binding upon both parties.

8.     **Representations and Warranty.**

8.1     LICENSOR WARRANTS THAT FOR A PERIOD OF 12 MONTHS FROM COMPANY'S OR ITS CUSTOMER'S, DISTRIBUTOR'S EACH USE OF EACH LICENSED TECHNOLOGY, WHICHEVER IS THE LATEST, OR [24] MONTHS IN CASE OF LATENT DEFECTS AND/OR ERROR, SUCH LICENSED TECHNOLOGY WILL SUBSTANTIALLY CONFORM TO THE SPECIFICATIONS STATED BY THE LICENSOR HERETO. LICENSOR'S SOLE LIABILITY AND CUSTOMER'S EXCLUSIVE REMEDY WITH RESPECT TO BREACH OF THE FOREGOING LIMITED WARRANTY WILL BE LIMITED TO ERROR CORRECTION OR REPLACEMENT, OR IF NEITHER IS EFFECTED WITHIN 30 DAYS, EQUITABLE REDUCTION IN LICENSE FEES OR TERMINATION OF THE LICENSE FOR SUCH LICENSED TECHNOLOGY AND FULL REFUND OF ANY AND ALL LICENSE FEE PAID BY COMPANY THEREFOR.

8.2     EXCEPT AS SPECIFICALLY SET FORTH ABOVE, THE LICENSED TECHNOLOGY IS PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING WITHOUT LIMITATION, ANY WARRANTY WITH RESPECT TO TITLE, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.

9.    **Confidentiality**

9.1   Confidential Information.   COMPANY shall retain in strict confidence all information disclosed by Licensor that Licensor has designated as being confidential in writing or, if disclosed orally, designated as confidential in writing within 30 days after such disclosure ("Confidential Information"). Notwithstanding the foregoing, Confidential Information shall include all of the Licensed Technology, including VHDL and Verilog that constitute or contain Confidential Information.   Except as otherwise provided herein, COMPANY shall not make such Licensed Technology available as unencrypted VHDL or Verilog to any third party.   COMPANY shall use the same degree of care as it uses with respect to its own confidential information of similar nature.  COMPANY shall limit its use of the Confidential Information to such uses as are permitted hereunder, namely in connection with the development of integrated circuits to be manufactured by or for COMPANY, and limit disclosure of such Licensed Technology outside of COMPANY to its contractors and End User's who have agreed in writing to similarly protect the Licensed Technology.

Licensor shall retain in strict confidence all information disclosed to by COMPANY that COMPANY has designated as being confidential in writing or, if disclosed orally, designated as confidential in writing within 30 days after such disclosure ("Confidential Information").  Licensor shall use the same degree of care as it uses with respect to its own confidential information of similar nature and shall not disclose said Confidential Information to any third party.

9.2     Exceptions.     COMPANY shall not be liable for disclosure or use of any data or information which (i) was in the public domain at the time it was disclosed or falls within the public domain, except through the fault of COMPANY; (ii) was known to COMPANY at the time of disclosure, which knowledge COMPANY shall have the burden of establishing by clear and convincing evidence; (iii) was disclosed after written approval from the Licensor; (iv) becomes known to COMPANY from a source other than the Licensor, who had a right to make such disclosure; or (v) was independently developed by COMPANY without the benefit of the Confidential Information received from the Licensor, which independent development COMPANY shall have the burden of establishing by clear and convincing evidence.

10     **Terms and Termination.**

10.1     Term. The term of this Agreement shall begin upon the Effective Date and shall continue until terminated in accordance with the terms of this Agreement.

10.2     Termination by Parties. If either party breaches a material provision of this Agreement and does not cure the breach within 30 days after written notice, which notice shall be given in accordance with the terms of this Agreement, from the other party, the non-breaching party shall have the right to: (i) suspend performance or payment until the breach is cured; (ii) terminate this Agreement; or (iii) seek such other remedies as are available at law or equity and are not limited by the terms of this Agreement.  If the breach involves a breach of Section 5, 6 or 9 or a delay in or failure to pay money when due, the cure period shall be ten business days.

10.3     Bankruptcy. Should either party: (i) become insolvent; (ii) make an assignment for the benefit of creditors; (iii) file or have filed against it a petition in bankruptcy or seeking reorganization; (iv) have a receiver appointed; or (v) institute any proceedings for liquidation or winding up; then the other party may, in addition to other rights and remedies it may have, terminate this Agreement immediately by written notice.

10.4     Obligation Upon Termination. Upon termination of this Agreement or any licenses granted under this Agreement, COMPANY shall return to Licensor or destroy any Licensed Technology received hereunder for which COMPANY's rights do not survive.  COMPANY shall provide written notice of such return or destruction to Licensor within 30 days after termination.

11.     **Damage Limitation.**  EXCEPT FOR CLAIMS UNDER SECTION 4, NEITHER PARTY SHALL BE LIABLE FOR ANY CLAIMS AGAINST THE OTHER PARTY BY ANY OTHER PARTY. EXCEPT FOR A WILLFUL OR GROSSLY NEGLIGENT BREACH BY A PARTY OF ITS DUTIES UNDER SECTION 9. NEITHER PARTY SHALL BE LIABLE TO THE OTHER OR ANY THIRD PARTY FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE LICENSED TECHNOLOGY OR OTHERWISE, INCLUDING WITHOUT LIMITATION, DAMAGES FOR LOSS OF DATA, COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SEVICES OR FOR ANY CLAIM OR DEMAND AGAINST EITHER PARTY BY ANY OTHER PARTY, OR OTHER PECUNIARY LOSS, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND IN NO EVENT WILL EITHER PARTY'S AGGREGATE LIABILITY FOR ANY AND ALL CLAIMS RELATING TO THIS AGREEMENT, WHETHER IN CONTRACT, TORT, OR ANY OTHER THEORY OF LIABILITY, EXCEED THE FEES PAID BY THE COMPANY UNDER THIS AGREEMENT, EXCEPT FOR CLAIMS UNDER SECTION 4.

12.   **Life Endangering Applications.**   Licensed Technology is not designed, made, or intended for use in any application where failure or inaccuracy might cause death or personal injury. Licensor shall not be liable in whole or in part, for any claims or damages arising out of or in connection with the use and performance of Licensed Technology in such applications. If COMPANY uses Licensed Technology for such applications, COMPANY will indemnify and hold harmless Licensor, its suppliers and its licensors from any claims, loss, cost, damage, expense, or liability, including attorneys' fees, arising out of or in connection with the use and performance of Licensed Technology in such applications.

13.   **General.**

13.1   Severability.  If any provision of this Agreement or the attachment(s) is held to be ineffective, unenforceable or illegal for any reason, in whole or in part, such decision shall not affect the validity or enforceability of any or all of the remaining portions thereof. Any such invalid, illegal or unenforceable provision or portion thereof shall be changed and interpreted so as to best accomplish the objectives of such provision or portion thereof within the limits of applicable law or applicable Court decision.

13.2   Assignment.  This agreement may not be transferred or assigned by either party, by operation of law or otherwise without the prior written consent of an authorized representative of the other. Notwithstanding the foregoing, either party may, without the prior consent of the other party, assign or transfer this Agreement as part of a corporate reorganization; consolidation, merger or sale of substantially all assets provided the said entity assumes all obligations in this Agreement.

13.3   Taxes.  Unless otherwise specifically provided in the exhibits to the Agreement, the amount of any present or future sales, revenue, excise or other tax or duty applicable to Licensed Technology covered by this Agreement, or the possession or use of Licensed Technology (including but not limited to any withholding taxes imposed on royalties by any country), shall be added to the prices and fees otherwise due and shall be paid by COMPANY.  In lieu of such payment, COMPANY shall provide Licensor with a tax exemption certificate acceptable to the appropriate taxing authorities.

13.4   Governing Law. This Agreement shall be construed in accordance with and all disputes hereunder shall be governed by the laws of the State of California, , without regard to principles of conflicts of laws.  The Superior Court of the State of California for Santa Clara County and/or the United States District Court for Northern California shall have jurisdiction and venue over any controversies, proceedings or disputes in connection with this Agreement.

13.5   Waiver.  No failure or delay on the part of either party in the exercise of any power, right or privilege under this Agreement shall operate as a waiver of such power, right or privilege, nor shall any single or partial exercise of any such power, right or privilege preclude any other or further exercise of that or of any other right, power or privilege.

13.6   Notice.  Any notice required or permitted to be given will be in writing and may be personally served, or sent by facsimile, mail or overnight courier and will be deemed to have been given: if personally given when served, if by facsimile machine to the proper facsimile number and confirmed by mail, if by overnight courier, upon receipt, or when mailed, by certified mail-return receipt requested on the fifth business day after deposit in the United States mail with postage prepaid and properly addressed as follows or at such other address that either party provides by advance written notice to the other party.

If to COMPANY:                                              If to Licensor:

Case5:09-cv-02172-JF   Document1-1   Filed05/18/09   Page9 of 13

Sonix Technology Co., LTD

Attn:    Tung Pei-Hui

10F-1, No.36, Taiyuan Street, Chupei City
 Hsinchu,

TW, R.O.C

Phone : 886-3-5600-888

Fax    : 886-3-5600-889

Arasan Chip Systems, Inc.

Attn: P.N. Rao

1150 N. First St., Ste #210
San Jose CA 95112

U.S.A

Phone : 408-282-1600

Fax    : 408-282-7800

13.7    Export Controls.  COMPANY understands that Licensor is subject to regulation by United States government agencies, which prohibit export or diversion of Licensed Technology to certain countries and certain persons.  Regardless of any disclosure COMPANY makes to Licensor of an ultimate destination of Licensed Technology or of Licensed Products, COMPANY will not export in any manner, either directly or indirectly, any Licensed Technology or Licensed Products without first obtaining all necessary approval from appropriate United States government agencies.

13.8    Other Licenses.  Nothing contained in this Agreement shall be construed as conferring by implication, estoppels or otherwise upon either party any license or other right except the licenses and rights expressly granted under this agreement

Page 9 of 13

13.9 <u>Entire Agreement</u>. This Agreement and the exhibits contain the entire agreement and understanding of the parties with respect to this subject matter and supersede all prior agreements, understandings and representations. No addition or modification to this Agreement is valid unless made in writing and signed by authorized representatives of the parties.

13.10 <u>Status as Independent Contractors</u>. The parties are independent contractors. Neither has the authority to bind the other to any third person or act in any way as the representative of the other, unless otherwise expressly agreed to in writing by authorized representatives of both parties.

13.11 <u>Agreement Not To Hire</u>. COMPANY understands that Licensor is not a staffing firm, but an ASIC design services company and invests in each of its employees in immigration, relocation, training, education, etc. and any hiring of its employees is detrimental to its business. COMPANY agrees not to solicit or hire Licensor's employees assigned to provide support on onsite consulting.

13.12 <u>Press Release</u>. Licensor may issue a press release stating that COMPANY has licensed Licensor's Technology as in Exhibit B.

13.13 <u>Surviving Obligations</u>. Each party's respective rights and obligations pursuant to Sections 4, 7, 8, 9, 10.4, 11, 12 and 13 shall survive expiration or termination of this Agreement.

COMPANY: **Sonix Technology Co., Ltd.**   LICENSOR: **Arasan Chip Systems, Inc.**

By:_____   By:_____

Name: _Pei-Hui Tung_____   Name: _____

Title: _Director_____   Title: _____

Date: _Feb. 20th, 2009_____   Date: _____

**EXHIBIT A  License Fee**

<u>Initial Design License Fee.</u>   The license fees for Single Use Initial Design and one additional use will be $370,000 USD and includes the following:

6.2.1 MIPI CSI2 RECEIVER with 2 PPI lanes plus 1 clock
            Detail: 2 X CSI2 IP Block with one extra PPI on each CSI2     170,000.00
            6.2.2 MIPI D PHY, (incl. Digital DPHY)3 instantiations (2 data lanes plus 1 clock)
            200,000.00 USD

<u>Additional Design License Fee.</u> The Additional Design License Fee for each new Additional Design will be:
            CSI2 IP Block                90,000.00
            Each additional PPI         10,000.00
MIPI D PHY, (incl. Digital DPHY) up to 3 instantiations 170,000.00 USD

Additional Design License Fees must be paid within 30 days from the incorporation of the Licensed Technology in a new design.

<u>Optional On-site Support Fee (Expenses not included)</u>

        **6.2.13  Optional One (1) Month of On-site support**     **$11,000.00**
        **6.2.14  Additional Months of On-site support**        **$18,000.00/mth**

**EXHIBIT B – Deliverables**

---

**Product MIPI CSI-2 Receiver**

Note: 2 PPI ports plus 1 clock.

**Deliverables:**
1. Verilog RTL of the MIPI Camera Serial Interface-2 (CSI-2) with AHB or AXI interface.
2. Verilog RTL of the CSI-2 Test Environment.
3. Technical Documentation

4. Test bench
5. Synthesis scripts for RTL compiler
6. User Guide (block diagram and integration guide included)

*Specification:*
(i) Fully compliant with the MIPI CSI-2 Version 1.0 Specification
(ii) AHB or AXI interface compliant with the AMBA Bus Specifications
(iii) Data processing speed over 1Gbps on TSMC 0.11um process

---

**Product MIPI D-PHY**

Note: (Includes Digital DPHY). 3 instantiations (2 data plus clock).

**Deliverables:**
1. GDSII- DPHY (Analog and Digital)
(a) Control and Interface Logic (CIL) Layer
(b) PHY Protocol Interface (PPI)

2. Verilog RTL- DPHY Test Environment
(a) D-PHY simulation model

3. Technical Documentation
(a) DPHY IP User's Guide
(b) Test Environment User's Guide
(c) Datasheet
GDSII

Specification:
(i) MIPI DPHY Version 0.9 Specification
(ii) Receiver can accept 1Ghz data input on TSMC 0.11um process

---